## COURT OF APPEALS.

SAMUEL H. CATLIN, respondent, agt. HARMON H. GUNTER, appellant.

By § 169 of the Code, it is provided that *no variance* between the allegation in a pleading and the proof shall be deemed material, unless it shall *actually* have misled the adverse party to his prejudice in maintaining his action or defence.

Now, in *all* actions, whenever it is alleged that a party has been misled, that fact must be *proved* to the satisfaction of the court; and the proof must show in what respect he has been misled; and thereupon the court may order the pleading to be amended upon such terms as shall be just.

Where the variance is not material, as above provided—merely, where the party has not proved that he has been actually misled, the court may either direct the fact to be found according to the evidence, or may order an immediate amendment without costs. (§ 170.) But if an allegation is unproved, not in some particular or particulars only, but in its *entire scope and meaning*, it is not to be deemed a case of variance, but a *failure of proof*. (§ 171.)

*Held*, that these provisions introduce a principle unknown to the former prac-

tice, namely, that of determining this class of questions, not by the incoherence of the two statements upon their face, and hence inferring their effect upon the state of the preparation of the party, but by proof *aliunde* as to whether the party was actually misled to his prejudice by the incorrect statement.

In this case, where the defence was usury, the plaintiff did not offer any proof, or even allege that he had been misled; but put himself upon the principle of the old rule, by alleging that the usurious contract set up in the answer, was different from that indicated by the proof; and hence insisting that the proof was not *within the issue;* and the case was decided in the court below against the defendant on that point.

*Held*, that if the discrepancy was a variance, as defined by the above provisions of the Code, it should have been regarded as immaterial, unless it amounted to a *failure of proof*, as defined by § 171; which was not warranted, taking the allegation of usury in the answer, in its entire scope and meaning, in connection with the circumstances and proof given on the trial: Conceding that the same rule must be applied to the defence of usury as would be applicable in other cases.

*December Term*, 1854.

APPEAL from a judgment of the superior court of the city of New-York. The action was commenced in 1851, to recover the amount of a promissory note, of which the defendant was the maker. It was dated February 24th, 1851, and was for the payment of $819.68, in five months from date, to the defendant's own order, and was endorsed by him. The complaint, after describing the note, averred that the plaintiff was the lawful holder and owner of it, and that the defendant was justly indebted to him in its amount.

The answer admitted the making of the note, but denied that the plaintiff was the lawful holder or owner, or that the defendant was indebted to him in the amount of it. The answer then set up usury in the following manner:—It averred that on the 24th of February, 1851, the defendant made the note sued on, and two other notes for the sums respectively of $840.16, and $590.16; and without consideration delivered them to S. M. Crandall, to have the same discounted; that Crandall delivered them to Silas Davenport, together with four other notes, made respectively by F. A. Talmadge, L. Schlosser, W. Durbridge, and Robert Hunter, for the respective amounts of $150, $117.50, $750, and $418.87; that Davenport left the

seven notes with W. A Beecher, as collateral security for the payment of the following loans, made by Beecher to Davenport, namely: one of $500 on the 18th March, and another of $1,000 on the 9th of April, and another of $1,300.75 on the 16th May, in the year 1851, for which sums Davenport gave his check on a bank in New-York; that upon each of those loans Davenport had agreed to pay Beecher interest at the rate of eighteen and three-quarter cents per day on each $100. There was a reply, taking issue upon the allegations in the answer. The cause was tried in May, 1852, before the late judge SAND-FORD, when the plaintiff gave in evidence the note declared on, and rested.

The defendant called *S. M. Crandall*, who testified that he received the note sued on, and three other notes from the defendant, without consideration paid to the defendant, and delivered them to Davenport to raise money upon for the witness. The other notes last mentioned were, one made by the defendant for $736.93, one made by R. Heslewood for $450, and one made by S. Schlosser for $119.50. In regard to the purpose for which the notes were given to him by the defendant, his testimony was as follows: "I was to give the defendant the money for his notes. There was no time mentioned when I was to give him the money, nor any particular money that I was to give him. The defendant was to have the money when he wished; and he had a right to call for the money at any time. I never paid the defendant for the notes. I would have paid the defendant if he had called for it, and I had got the money. The notes were for my benefit thus far, that I could use the money until the defendant called for it." Davenport was then examined on behalf of the defendant, and testified that he received the note sued on, and the three other notes mentioned by Crandall, from him, and delivered them to Beecher, to secure $1,500, which he borrowed of Beecher on the 18th of March, 1851, and for which he gave Beecher his check, which he calls a "memorandum check." As to the allegation of usury, he said, "I do not recollect of any specific agreement made at the time of this loan between

me and said Beecher.   I had made several loans of him at several times previously, which were at eighteen pence per day on one hundred dollars.

This testimony the court held to be immaterial, unless the plaintiff should connect it with the loan in question.   Davenport further testified that on the 9th of April, 1851, he paid Beecher $500, on account of this loan of $1,500 and took back the defendant's note for $736.93; and at the same time he, the witness, paid him, Beecher, $57.88 "for the use of the $1,500 from the 18th of March, 1851, to that day, according to my memorandum, and gave Beecher a new memorandum check for $1,000." The plaintiff objected that this evidence was irrelevant, and not *within the issue*; but the question of variance does not appear to have been decided at that time.

It appeared that the plaintiff purchased the note, after it became payable, of Messrs. Bulkley & Claflin.   After some other testimony, not bearing upon the question of usury, the defendant rested; and the judge expressed his opinion that the defendant had failed to prove his defence, and directed the jury to find a verdict for the plaintiff for the amount of the note, and interest.   The defendant excepted.   Verdict and judgment for the plaintiff.   The judgment was affirmed at the general term—(the opinion being given by DUER, J., who placed the decision mainly upon the ground of variance.)

ANDREW THOMPSON, *for appellant.*

CHARLES P. KIRKLAND, *for respondent.*

By the court—JOHNSON, J.   The plaintiff's counsel insists, in the first place, that the note upon which this action was brought had a legal inception in the hands of Crandall.   If this is so, no subsequent negotiation of it, upon a usurious consideration, could defeat the action against the maker.   If this point should be decided against him, he then contends that there was no evidence of usury sufficient to have been submitted to the jury; but, if wrong in this, he further maintains that the usurious contract which the evidence tended to prove

was so far variant from that set up in the answer, that it could not be rightfully received; and that upon this ground the ruling at the trial ought to be sustained.

(1.) The transaction between the defendant and Crandall is obscurely stated. It is, however, pretty apparent that the note was delivered to the latter to enable him to raise money, by negotiating it. Whether he was to do this for the benefit of the defendant, and as his agent, or whether the note was lent to him for his own accommodation, is not clear. But in either case the paper did not become operative until it was passed away for value. There seems to me to be no foundation for the argument, that Crandall purchased the note of the defendant; and the case is not within the reason of those decisions in which it is held, that an exchange of notes constitutes them both business paper. (*Dowe* agt. *Schutt,* 2 *Denio,* 64, *and the cases cited.*) The remark of the witness, that he would have paid the defendant for the notes if he had called for it, and the witness *had got the money,* implies very strongly that the notes were to be used to raise money for the benefit of the defendant. He says, in terms, that the defendant received no consideration for the notes. If this is to be understood literally, it of course puts an end to the idea that the note had become operative when delivered to him. If he means only to negative the fact of payment in money, and to have it understood that he made some engagement which was equivalent to his own note, and which would constitute a consideration for the transfer to him of the note in question, the arrangement should have been stated with such perspicuity that the court could judge of its character and effect. Upon the testimony which was given, I am of opinion that the jury might rightfully have found, that the note in question was delivered to Crandall, to enable him to raise money upon it for the benefit of the defendant, or for his own accommodation.

(2.) The evidence of usury was sufficient to be submitted to the consideration of the jury. On the 18th of March, 1851, Davenport borrowed $1,500 of Beecher, and the question is, whether this money was lent at a usurious rate of interest?

Davenport was not able to deny positively that there was an agreement for illegal interest. He could not recollect. The case is pretty much as it would be if there was no direct evidence of the making of the contract. On the 9th of April,—twenty-two-days after the loan,—Davenport paid, and Beecher received, $51.88 "for the use of the $1,500 from the 18th of March to that day." This was some evidence of an agreement for a rate of interest which would produce that amount, coeval with the loan. I agree with the court below, that evidence of prior usurious loans would not alone affect this contract; but connected as that evidence was with the subsequent receipt of usurious interest, for all the time which elapsed between the loan and the receipt of that money, it made a case to be left to the jury. I do not say that they must necessarily have found that the loan was usurious, but only that the evidence was suitable to be submitted to them.

(3.) It is the remaining question alone which presents any difficulty. There is a wide discrepancy between the usurious contract set up in the answer, and the one which the evidence tended to prove. According to the former, the note in controversy was negotiated by being delivered, together with six other notes, which are described, as collateral security for the payment of three several sums, of $500, $1,000, and $1,300.75, lent at different-times by Beecher to Crandall, at a rate of interest equivalent to eighteen and three-quarter cents per day on $100. According to the testimony, this note and three others, only one of which corresponds with any of the six notes mentioned in the answer, were transferred as security for one sum of $1,500 loaned on the 18th of March, 1851, to Crandall by Beecher; and the rate of interest indicated by the evidence would be something over twenty-two cents per day on $100, instead of the rate mentioned in the answer. There is a correspondence between the allegations and the proof to this extent; they concur in the position that the note in suit was transferred by Crandall to Beecher, with other notes, as security for a loan made by the latter to the former, which loan was at an usurious rate of interest, and in respect to which Crandall

also gave to Beecher his check on a bank. The point as to the variance, I understand to have been made by the objection which the plaintiff took that the proof was not within the issue in the cause. If the Code of Procedure has not changed the rule which is to govern this case, the court below was clearly right in holding, as it did, that there was a fatal variance. The cases are uniform and consistent, and several of them are referred to in *Rowe* agt. *Philips*, (2 *Sand. Ch. R.* 14.) The Code, however, contains provisions on the subject of variance applicable to all actions; and if they establish a different rule from the one recognized in these cases, we are bound to apply it, though thereby the plaintiff suffer a loss which, by the defendant's slip in pleading, he would have avoided under the former rule. It is provided, in the first place, that no variance between the allegation in a pleading and the proof shall be deemed material, unless it shall *actually* have misled the adverse party to his prejudice in maintaining his action or defence. (§ 169.) Then it is not left to the judgment of the court whether, in a given instance, it was calculated to mislead, and how much to hold that it did mislead; but whenever it is alleged that a party has been misled, that fact must be *proved* to the satisfaction of the court; and the proof must show in what respect he has been so misled; and thereupon the court may order the pleading to be amended upon such terms as shall be just. (*id.*) Where the variance is not material, as above provided, merely where the party has not proved that he has been actually misled, the court may either direct the fact to be found according to the evidence, or may order an immediate amendment without costs. (§ 170.) But if an allegation is unproved, not in some particular or particulars only, but in its *entire scope and meaning*, it is not to be deemed a case of variance, but a failure of proof. (§ 171.) These provisions introduce a principle unknown to the former practice, namely, that of determining this class of questions, not by the incoherence of the two statements upon their face, and hence inferring their effect upon the state of the preparation of the party, but by

proof *aliunde* as to whether the party was actually misled to his prejudice by the incorrect statement.

In this case the plaintiff did not offer any proof of the character suggested, nor did he ever allege that he had been misled. He put himself upon the principle of the old rule, by alleging that the usurious contract set up in the answer, was different from that indicated by the proof, and hence insisting that the proof was not within the issue. If, then, the discrepancy was a variance, as defined by these provisions, it should have been regarded as immaterial ; and the only question is, whether it was a fault of that character, as a failure of proof as defined by section one hundred and seventy-one. What was the " scope and meaning " of the allegation of usury in the answer? In general terms, it was that the note was negotiated at its inception upon an usurious consideration. Such a general allegation in an answer, it is conceded, would be bad for its generality. But certain particulars were added, which were true. The name of the party to whom the note was passed was given. The general character of the transaction was stated, to wit: that it was delivered to that person, with other notes, as collateral security for a loan of money, and the name of the borrower was correctly stated. To this was added the fact, with which the evidence corresponded, that the loan was evidenced by the check of the borrower. Then certain circumstances were stated, which have already been mentioned, which the evidence did not confirm, but disproved; that is to say, the particular additional notes transferred for the same purpose, the number of loans, and the amount of the rate of the usurious interest.

In my opinion, these circumstances were accidental merely, and did not constitute the entire scope and meaning of the allegations in the sense of the provisions of the Code. We are not, I concede, warranted in applying a different rule to the defence of usury from that which we would hold applicable in other cases. It is a defence allowed and provided by law. The defendant, in seeking to avail himself of the evidence, not-

withstanding the variance, did not claim an indulgence from the court, but simply asked for the application of those rules which the legislature has provided for all cases indiscriminately, whether the party, invoking their exercise, was seeking to visit his adversary with a forfeiture or not.   The law has not made any distinction between such defences and those where no forfeiture is involved, and the court can make none.   If the sense of the legislature is plainly expressed, as it seems to me to be, we have no judgment to pass upon the policy of those provisions.   It is apparent, that in many cases the record will not furnish a true account of the issue actually tried and determined ; and I can foresee some difficulty when it shall be necessarily used as evidence of a former judgment.   Perhaps some of the inconveniences which might be expected to arise, may be avoided by the provisions of section one hundred and seventy-two, by which the courts are authorized, even after judgment, to conform the pleading to the facts proved.   But, however this may be, we cannot dispense with the new rule which the Code has established.

I cannot doubt that the difficulty under which the defendant labored in this case, was a variance merely, which, not having been proved to have misled the plaintiff, should have been considered immaterial.

The judgment should be reversed, and a new trial ordered in the supreme court.